## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| DIOPSYS, INC.<br><br>Plaintiff,<br><br>v.<br><br>KONAN MEDICAL USA, INC., and<br>GEORGE HU,<br><br>Defendants. | Civil Action No. 2:15-cv-05882-WHW-CLW<br><br>**SECOND AMENDED COMPLAINT AND JURY DEMAND**<br><br>ECF Case |

Plaintiff, Diopsys, Inc., ("Diopsys" or "Plaintiff") hereby sues Defendants Konan Medical USA, Inc. ("Konan") and Dr. George Hu ("Hu," and collectively "Defendants") and alleges as follows:

### THE PARTIES

1.      Plaintiff is a corporation of the State of New Jersey having a place of business at 16 Chapin Road, Suite 912, Pine Brook, NJ 07058.

2.      Plaintiff is a medical instrumentation company specializing in vision testing equipment.

3.      Konan is a California corporation having a place of principal business at 15 Marconi, Suite A, Irvine, CA 92618.

4.      Upon information and belief, Hu is a resident of New Jersey residing at 106 Anderson St., Raritan, NJ 08869.

### JURISDICTION AND VENUE

5.      This is a civil action arising under the Patent Laws of the United States relating to Defendants' infringement of U.S. Patent No. 6,475,162, entitled "System and Method for Vision

Examination Using Interrupt Signals for Synchronizing Visual Evoked Potential Sampling Rate with Visual Stimulus" ("the '162 Patent"), U.S. Patent No. 7,578,795 entitled "System and Method for Vision Examination Utilizing Fault Detection" ("the '795 Patent") and U.S. Patent No. 9,026,189 entitled "Electrode Sensor Assembly for Electroretinography and Pattern Electroretinography" ("the '189 Patent"), copyright infringement, unfair competition, product disparagement, as well as for reformation of a settlement agreement relating to the '162 Patent and to U.S. Patent No. 6,966,650, entitled "Method and Apparatus for an Automated Procedure to Detect and Monitor Early Stage Glaucoma" ("the '650 Patent").[1]  The '650 Patent reasonably describes the general operation of aspects of the accused EvokeDx device.

6.      The jurisdiction of this Court arises under 28 U.S.C. § 1331 and §§ 1338(a) and (b).  The Court also has supplemental jurisdiction under 28 U.S.C. § 1367(a) over Plaintiff's state law claims because the claims form part of the same case or controversy as the federal patent law claim.

7.      This Court has personal jurisdiction over Konan because Konan has conducted commercial activities, and/or continues to conduct commercial activities within the state of New Jersey.  Konan is engaged in the business of developing, manufacturing, and selling medical instruments used in vision testing.

8.      Konan offers products and information about purchasing its products on the internet through its interactive website, www.konanmedical.com, and it admits to conducting business throughout the fifty States of the United States including in the State of New Jersey. Konan also offers downloadable software applications on its website and additionally sells

---

[1] The Second through Fourth claims for relief for declaratory judgment and reformation are governed by a stipulation entered into between the parties and so ordered by the Court on February 29, 2016.  ECF No. 37.

software applications through third party platforms such as Google Play and Apple's App Store.

9.     On information and belief, Konan directly and/or through intermediaries, makes, uses, imports, provides, offers for sale and/or sells its products and services, including but not limited to the products and/or services that are accused of infringement in this lawsuit, within the State of New Jersey and in this judicial district.  Konan has committed and continues to commit acts of direct and indirect infringement in this judicial district by making, using, importing, providing, offering for sale, and/or selling infringing products and/or providing infringing services in New Jersey, as alleged hereafter.  In addition, Konan regularly does and/or solicits business or engages in other persistent course of conduct or derives substantial revenue from goods used or consumer services rendered in interstate commerce, including in the State of New Jersey, (a) that violate Plaintiff's patent rights or (b) that Defendants reasonably expected or should have expected would violate Plaintiff's patent rights.

10.     This Court has personal jurisdiction over Hu because Hu is a resident of New Jersey.

11.     This Court also has personal jurisdiction over Hu because this case arises in part out of a settlement agreement entered into between Diopsys and Hu (the "Settlement Agreement"), Section 18 of which provides that "[t]his Agreement and Release shall be construed at all times in accordance with and shall be governed by the laws of the State of New Jersey…and any action to enforce its terms shall be brought within the State of New Jersey."  A true and correct copy of the Settlement Agreement is attached hereto as Exhibit A.

12.     The Settlement Agreement arises out of a lawsuit brought in New Jersey State court by Diopsys against Hu et. al (*Diopsys Inc. v. George Hu et al.*, Superior Court of New Jersey, Chancery Division; Morris County, Docket No. MRS-C-131-06) (the "State Action").

Hu, inter alia, ultimately entered into the Settlement Agreement with Diopsys to resolve the State Action.

13.     On December 15, 2015, Konan filed its Answer, Affirmative Defenses and Counterclaims to the Complaint in this action ("Answer").   ECF 15.   In its Answer, Konan alleges as a defense to patent infringement that Plaintiff is barred from asserting infringement of the '162 Patent against Konan due to the Settlement Agreement resolving the State Action.  ECF 15, Konan's Defenses, ¶5.

14.     Venue is proper in this district under 28 U.S.C. §§ 1391 (b), (c), and/or (d) and 28 U.S.C. §§ 1400(a) and/or (b), for the reasons, inter alia, that Defendants reside in this district, do business in this district, have committed acts of infringement in this district and/or have agreed to be bound by New Jersey law interpreting the Settlement Agreement.

15.     On information and belief, Defendants' activities constitute purposeful activities in New Jersey in relation to the causes of action alleged.

## BACKGROUND

16.     Hu was a full-time employee of Diopsys from on or about January, 2001 to on or about October, 2002 and was employed as a consultant to work for Diopsys prior to January 2001.

17.     During Hu's employment at Diopsys, Hu invented a system for performing vision examination using interrupt signals for synchronizing visual evoked potential sampling rate with visual stimulus.  On or about August 7, 2001, Diopsys filed a patent application entitled "System and Method for Vision Examination Using Interrupt Signals for Synchronizing Visual Evoked Potential Sampling Rate with Visual Stimulus."   The U.S. Patent and Trademark Office ("the USPTO") ultimately approved the patent application as the '162 Patent.  A true and correct copy

of the '162 Patent is attached hereto as Exhibit B.

18.     On August 25, 2009, the '795 Patent was duly and lawfully issued by the USPTO. A copy of the '795 Patent is attached as Exhibit C hereto.

19.     Hu assigned any and all his rights to the '162 Patent and the '795 Patent to Diopsys on or about August 7, 2001.

20.     Diopsys is the sole owner of the entire rights, title, and interest in and to the '162 Patent and the '795 Patent.

21.     On May 5, 2015, the '189 Patent was duly and lawfully issued by the USPTO.  A copy of the '189 patent is attached as Exhibit D.

22.     Diopsys is the sole owner of the entire rights, title, and interest in and to the '189 Patent.

23.     In or about April, 2015, Plaintiff learned that Konan was utilizing certain technology in a product sold as EvokeDx ("EvokeDx") which Konan offers for sale and sells.

24.     Plaintiff conducted an investigation and concluded that Konan's EvokeDx product infringes the '162 Patent.  Furthermore, Plaintiff's investigation concluded that Hu assisted Konan in designing its infringing EvokeDx product and licensed certain rights to Konan, which are part of the EvokeDx product.

25.     Upon information and belief, Hu benefits from the sale of the EvokeDx product.

26.     Before this lawsuit was commenced, Defendants were aware of the '162 Patent.

27.     Defendants never requested permission from Diopsys to use the inventions of the '162 Patent.

28.     Konan continues to promote, offer for sale and sell its EvokeDx products.

## FIRST CLAIM FOR RELIEF

### Patent Infringement of the '162 Patent

29.     Plaintiff repeats and re-alleges each and every allegation contained in the preceding paragraphs as if set forth in full herein.

30.     Plaintiff has the right to sue and recover for infringement of the '162 Patent.

31.     Konan has infringed and continues to infringe the '162 Patent, either literally and/or under the doctrine of equivalents, by making, using, providing, offering, offering for sale, and/or selling in the United States certain methods, equipment, and/or systems disclosed and claimed in the '162 Patent, including, but not limited to Konan's EvokeDx product.

32.     Konan has infringed and is still infringing, one or more claims of the '162 Patent, including but not limited to those claims listed below, and such infringement is occurring in this district and elsewhere in the United States, by making, using, selling, and offering for sale products that embody the inventions claimed in the '162 Patent under 35 U.S.C. § 271(a).

33.     Konan infringes and continues to infringe at least Claim 1 of the '162 Synchronizing Patent, and selling a device that contains each and every element thereof – at least as set forth in the following paragraphs hereinafter.

34.     The EvokeDx system has an OLED Monitor which is "a means for presenting a series of sensory stimuli for perception by a patient" as set forth in Claim 1 of the '162 Patent. *See e.g.*, Exhibit E, page 1.

35.     The EvokeDx system processor has a "contrast-reversing checkerboard stimulus" routine, which is a "means for generating electrical signals representing said patient's evoked potentials in response to said sensory stimuli" as set forth in Claim 1 of the '162 Patent. *See e.g.*, Exhibit F, pages 10-11.

36.     The EvokeDx system includes "electrode/electrode cables" which are a "means

6

connected to said generating means for detecting said signals" as set forth in Claim 1 of the '162 Patent. *See e.g.*, Exhibit E, page 7.

37.     The EvokeDx system is provided with an "Integrated Double Shielded 2 – Channel Amplifier" which is a "means connected to said detecting means for amplifying said signals" as set forth in Claim 1 of the '162 Patent. *See e.g.*, Exhibit G, page 1.

38.     The EvokeDx system is equipped with "Single or dual channel recording," which is a "means connected to said amplifying means for recording data representative of said signals" as set forth in Claim 1 of the '162 Patent. *See e.g.*, Exhibit G.

39.     The EvokeDx system processor performs "Advanced, multivariate analytics [to] distill the complex VEP waveform in easy to interpret result," "Provides clear statistical assessment to determine if two response functions…differ significantly," and uses "Statistical criteria…to determine if each frequency response…is significant," all of which constitute "means connected to said recording means for measuring said data" as set forth in Claim 1 of the '162 Patent. *See e.g.*, Exhibit E, page 3.

40.     The EvokeDx system performs "Synchronous data collection" whereby, "data collection is synchronized with the stimulus frame rate" which is a "means connected to said measuring means for synchronizing the presentation of said series of sensory stimuli with the rate of sampling said evoked potential signals by generating interrupt request signals for initiating and conducting said sampling" as set forth in Claim 1 of the '162 Patent. *See e.g.*, Exhibit G.

41.     The EvokeDx system also infringes on one or more of the claims depending from Claim 1 of the '162 Patent.

42.     Konan directly and indirectly infringes Claim 8 of the '162 Patent, by making,

using and selling the EvokeDx device which performs each and every method step recited therein, inter alia, by performing "Synchronous data collection," where the synchronization is controlled via a "graphics card" or an equivalent thereto.

43.     Plaintiff provided notice of its patent rights as set forth in the '162 Patent in full compliance with the provisions of 35 U.S.C. § 287(a).

44.     In addition to the allegations of direct infringement alleged in the preceding paragraphs, Konan has contributorily infringed and is contributorily infringing the '162 Patent, including but not limited to the EvokeDx product.

45.     In addition to the allegations of direct and contributory infringement alleged in the preceding paragraphs, Konan has infringed indirectly and continues to infringe indirectly the '162 Patent by active inducement under 35 U.S.C.§ 271(b), by making, using, utilizing, offering, offering for sale, and/or selling certain methods and/or systems disclosed and claimed in the '162 Patent.  Konan has induced and continues to induce others, including customers and end-users, to directly infringe one or more claims of the '162 Patent.

46.     Hu had actual knowledge of the '162 Patent and has induced infringement of the same by assisting Konan in designing its infringing EvokeDx product.

47.     Defendants will continue to infringe the '162 Patent unless enjoined by this court.

48.     As a direct and proximate result of Defendants' conduct, Plaintiff has suffered and will continue to suffer irreparable injury for which it has no adequate remedy at law. Plaintiff also has been damaged and, until an injunction issues, will continue to be damaged in an amount yet to be determined.

49.     Plaintiff seeks enhanced damages pursuant to 35 U.S.C. § 284 and a finding that because Defendants' infringement of the '162 Patent has been and continues to be willful, this is

an exceptional case within the meaning of 35 U.S.C. § 285, entitling Plaintiff to its attorneys' fees and expenses.

50.     Defendants' acts of infringement have caused damage to Plaintiff, and Plaintiff is entitled to recover from Defendants the damages sustained by Plaintiff as a result of Defendants' wrongful acts in an amount subject to proof at trial.

<u>**SECOND CLAIM FOR RELIEF**</u>

<u>**Reformation of the Settlement Agreement**</u>

51.     Plaintiff repeats and re-alleges each and every allegation contained in the preceding paragraphs, as if fully set forth herein.

52.     Hu signed agreements assigning inventions made relating to their work while working for Diopsys.

53.     Diopsys was formed to acquire, enhance and develop the assets, technology and intellectual property of Brainworks, Inc. ("Brainworks") in order to market the assets to, among others, physicians, eye care professionals and eye care institutions.

54.     Brainworks was formed in 1997 and owned the "visual evoked potential" screening technology and related equipment used to diagnose and monitor disorders of the eye, ear and brain.

55.     Diopsys eventually acquired Brainworks in or around January 1999, including all of Brainworks' intellectual property and equipment related thereto, all of which was assigned to Diopsys.  Prior to being acquired, Brainworks owned the "visual evoked potential" screening technology and all of the related intellectual property and equipment.

56.     Part of Diopsys' goals in acquiring Brainworks and its intellectual property were to (i) reduce the amount of time needed to conduct the "visual evoked potential" screening test owned by Brainworks and (ii) make the technology more user friendly.

9

57.     To achieve these goals, Diopsys developed software (and source code for the software) to apply the acquired "visual evoked potential" screening technology as it related to the diagnosis and monitoring of disorders of the eye, including "refraction errors," "strabismus" and amblyopia (lazy eye)."  Diopsys developed the software which permitted the test for these eye disorders to be conducted in one or two minutes per eye and made the software user friendly.

58.     In addition, Diopsys used its software to further apply the acquired "visual evoked potential" screening technology to test for glaucoma and other eye disorders.

59.     Vance Zemon ("Zemon") was one of the original developers of the "visual evoked potential" screening technology and was part owner and operator of Brainworks at the time it was acquired by Diopsys and assigned its intellectual property to Diopsys.

60.     As part of the acquisition, Zemon (and three other shareholders of Brainworks) were given shares of Diopsys stock.  Thereafter, Zemon became a member of the Diopsys Scientific Advisory Board, served as a Consultant to Diopsys and continued work on "visual evoked potential" screening technology at Diopsys.

61.     After Brainworks was acquired by Diopsys, Zemon referred Hu to Diopsys as an independent consultant to develop the technology necessary to make the newly acquired "visual evoked potential" screening technology marketable and commercially viable.

62.     On or about January 23, 2001, Hu was hired as a full time employee of Diopsys. Hu signed an Intellectual Property and Non-Disclosure Agreement, which including the following material terms:

     (i)     That all intellectual property to which Hu was exposed, or which he developed, was and would be the property of Diopsys, and that he would disclose to Diopsys and convey to Diopsys all such intellectual property, including all intellectual property he developed during his relationship with Diopsys;

     (ii)    That Hu would not disclose or divulge any of Diopsys intellectual

10

property (software and source code) to any individual or entity without the prior written consent of the Board of Directors of Diopsys; and

(iii)     That in the event of any violation of the Hu Agreement, Diopsys would be entitled to obtain preliminary and permanent injunctive relief against Hu from a court of competent jurisdiction.

63.     On or about August 6, 2001, Zemon executed an agreement confirming his assignment to Diopsys of all intellectual property related to the "visual evoked potential" screening technology.

64.     Upon information and belief, and without the knowledge and/or consent of Diopsys, Hu and Zemon worked on a project while they were working with Diopsys relating to early detection of glaucoma using Diopsys' technology modified for such glaucoma use.

65.     On or about June 27, 2003, and without the knowledge and/or consent of Diopsys, Hu and Zemon filed U.S. Patent Application No. 10/608,627 with the U.S. Patent & Trademark Office directed to early detection of glaucoma. In their application, Hu and Zemon, more specifically, sought patent protection related to a method and apparatus for an automated procedure to detect and monitor early stage glaucoma using visual evoked potentials measured in response to periodic stimuli presented to patients which Hu and Zemon allegedly invented.

66.     Hu and Zemon's Patent Application No. 10/608,627 was approved and ultimately issued as the '650 Patent. A true and correct copy of the '650 Patent is attached hereto as Exhibit H.

67.     The '650 Patent was unknown to Diopsys at the time it was issued.

68.     In 2006, Diopsys filed the State Action against Hu and Zemon, *inter alia*, for claims arising out of Hu and Zemon's filing for the '650 Patent. Diopsys, Hu and Zemon entered into the Settlement Agreement in order to resolve the State Action and to settle a number of issues that are now related to this action.

69.     Due to the acquisition of Brainworks by Diopsys and assignment agreements signed by Hu and Zemon assigning inventions made relating to their work while employed at Diopsys, Diopsys had a right to have assigned to it the '650 Patent.

70.     However, as part of the Settlement Agreement, Diopsys agreed that the invention of the '650 Patent could be owned by Hu and Zemon and be used by them.

71.     The parties agreed and the Settlement Agreement provides that Hu and Zemon could continue to own the '650 Patent:

> 6.     Diopsys on behalf of itself and its parent, affiliate and subsidiary companies now or hereinafter formed, agrees that it shall not challenge and will not initiate any patent litigation or claims of infringement concerning the patent authored by George Hu entitled "Method and Apparatus for an Automated Procedure to Detect and Monitor Early-Stage Glaucoma" (US Patent 6,475,162) hereafter, the "Hu Patent") as that patent currently exists and has been made known to Diopsys.  Diopsys further agrees to waive and covenant not to contest, sue, challenge or claim any right to or initiate any patent litigation or claim infringement with respect to the Hu Patent.
>
> Exhibit A, ¶ 6.

72.     Paragraph 6 identified the subject matter of the '650 Patent, entitled "Method and Apparatus for an Automated Procedure to Detect and Monitor Early-Stage Glaucoma," under which Hu and Zemon would continue their work without interference by Diopsys, as intended by the parties.

73.     However, a mistake was made while drafting the Settlement Agreement.  A typographical error incorrectly identified the '162 Patent and not the '650 Patent.  That is, the Settlement Agreement accurately listed that Diopsys was releasing claims related to the subject matter of the '650 Patent, but incorrectly identified that patent with the number of the '162 Patent.

74.     The parties intended that the Settlement Agreement release claims under the '650

Patent, not the '162 Patent.  Indeed, several paragraphs in the Settlement Agreement (aside from paragraph 6) illustrate the parties' intent, including paragraph 12, which reserves to Diopsys the right to sue for patent violations.

75.     The erroneous listing of the number of the '162 Patent in paragraph 6 of the Settlement Agreement has now been asserted by Konan in its Answer as an affirmative defense prohibiting a suit for infringement under the '162 Patent.  Konan's affirmative defense is unconscionable and asserted in bad faith, and if successful, would bar Diopsys from suing Konan for infringement of the '162 Patent, which contradicts the parties' intent when drafting the Settlement Agreement.

76.     Plaintiff is entitled to reformation of the Settlement Agreement to correct the typographical error contained in paragraph 6 and list the number of the '650 Patent and not the '162 Patent following the subject matter "Method and Apparatus for an Automated Procedure to Detect and Monitor Early-Stage Glaucoma".

77.     Plaintiff has no adequate remedy at law.

## THIRD CLAIM FOR RELIEF

### Declaratory Judgment That The Settlement Agreement Covers The'650 Patent

78.     Plaintiff repeats and re-alleges each and every allegation contained in the preceding paragraphs, as if fully set forth herein.

79.     While Paragraph 6 of the Settlement Agreement may be considered ambiguous because of the identification of the subject matter of the '650 Patent and the erroneous use of the '162 Patent number, the parties understood that the '650 Patent was intended to be covered by paragraph 6.

80.     Paragraphs 6 and 12 were intended to cover and release claims related to the '650 Patent, with Diopsys retaining the right to sue for patent violations of the '162 Patent, which the

parties did not intend to cover in the Settlement Agreement.

81.    There is an actionable controversy between the parties as to whether the Settlement Agreement precludes Diopsys from bringing an action to enforce the '162 Patent.

82.    Diopsys is entitled to a declaration that the Settlement Agreement does not restrict Diopsys' ability to enforce the '162 Patent.

83.    Plaintiff has no adequate remedy at law.

**FOURTH CLAIM FOR RELIEF**

**Declaratory Judgment That The '650 Patent Is Assigned To Diopsys**

84.    Plaintiff repeats and re-alleges each and every allegation contained in the preceding paragraphs, as if fully set forth herein.

85.    The Settlement Agreement was intended to cover and release claims related to the '650 Patent and not the '162 Patent.  However, if the Court rules that paragraph 6 of the Settlement Agreement covers the '162 Patent and not the '650 Patent, Diopsys then seeks an order from this Court that Diopsys is assigned the '650 Patent pursuant to the ownership assertions of Diopsys of work done by Hu and Zemon while employed at Diopsys and the various assignment agreements as described above.

86.    There is an actionable controversy between the parties as to whether the Settlement Agreement precludes Diopsys from bringing an action to enforce the '162 Patent.

87.    Diopsys is entitled to a declaration that, in the event the Court determines that Diopsys has no right under the Settlement Agreement to enforce the '162 Patent, then Diopsys has all rights to enforce the '650 Patent.

88.    As a consequence, Diopsys reserves the right to subsequently institute a patent infringement action against Defendants under the '650 Patent (which, upon information and belief, is licensed by Hu and Zemon to Konan).

14

89.     Plaintiff has no adequate remedy at law.

## FIFTH CLAIM FOR RELIEF

## Patent Infringement of the '795 Patent

90.     Plaintiff repeats and re-alleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

91.     Plaintiff has the right to sue and recover for infringement of the '795 Patent.

92.     Konan has infringed and continues to infringe the '795 Patent, either literally and/or under the doctrine of equivalents, by making, using, providing, offering, offering for sale, and/or selling in the United States certain methods, equipment, and/or systems disclosed and claimed in the '795 Patent, including, but not limited to Konan's EvokeDx product.

93.     Konan has infringed and is still infringing, one or more claims of the '795 Patent, including but not limited to those claims listed below, and such infringement is occurring in this district and elsewhere in the United States, by making, using, selling, and offering for sale products that embody the inventions claimed in the '795 Patent under 35 U.S.C. § 271(a).

94.     Konan infringes and continues to infringe at least Claim 1 of the '795 Patent, and selling a device that contains each and every element thereof – at least as set forth in the following paragraphs hereinafter.  Diopsys recently had sufficient possession of the EvokeDx machine to operate it and determine issues relating to infringement of the '795 Patent.

95.     The EvokeDx is a system for performing a medical examination.

96.     The EvokeDx system has an OLED Monitor which is "a means for presenting a series of sensory stimuli for perception by a patient" as set forth in Claim 1 of the '795 Patent. *See e.g.*, Exhibit E, page 1.

97.     The EvokeDx system processor has a "contrast-reversing checkerboard stimulus" routine, which is a "means for generating electrical signals representing said patient's evoked

potentials in response to said sensory stimuli" as set forth in Claim 1 of the '795 Patent. *See e.g.*, Exhibit F, pages 10-11.

98.    The EvokeDx system uses a plurality of electrodes configured to be connected to a scalp of the patient, wherein at least one electrode is configured to be placed over a visual cortex of the patient or the equivalent thereof. *See e.g.*, Exhibit E, pages 2, 6.

99.    The EvokeDx system is provided with an "Integrated Double Shielded 2 – Channel Amplifier" which is a "means connected to said detecting means for amplifying said signals" as set forth in Claim 1 of the '795 Patent. *See e.g.*, Exhibit G.

100.    The EvokeDx system has means for converting said signals into digitized data and to connect to said means for amplifying. *See e.g.*, Exhibit H, column 5, lines 26-31.

101.    The EvokeDx system is equipped with "Single or dual channel recording," which is a "means connected to said amplifying means for recording data representative of said signals" as set forth in Claim 1 of the '795 Patent. *See e.g.*, Exhibit G.

102.    In general, the fault detection system of the '795 Patent runs a series of different tests based upon the data collected as the image on the screen changes.  There are a number of individual sub-tests within a set period of time while the patient is looking at a screen.  During some of the individual sub-tests there can be noise or other factors which constitutes a fault.  For each of the sub-tests, there are a certain maximum number of faults in data collection that are acceptable in order to allow the test to be considered reliable.  The Diopsys system works according to the '795 Patent to determine if more than the maximum number of faults in a sub-test is exceeded.  The EvokeDx System, upon information and belief has a computer programmed to perform fault detection as generally described above.

103.    Upon information and belief, the EvokeDx system has a computer processor

programmed to analyze said data and to compare said data to predetermined values to determine if said data is outside of predetermined ranges and thus indicates unreliable data results, connected to said means for measuring and to said means for recording. *See e.g.*, Exhibit H, Fig. 1.

104.    Upon information and belief, the EvokeDx system has means for recording records each occurrence of data being outside of predetermined ranges. *See e.g.*, Exhibit H, Fig. 1.

105.    Upon information and belief, the EvokeDx system has a computer processor which is programmed with a predetermined maximum value of a plurality of faults and is further programmed to continue to collect data notwithstanding detection of a fault until after determining said predetermined maximum value of said plurality of faults and is programmed to stop the collection of data after receiving an indication that the data collected is reliable. *See e.g.*, Exhibit H, Fig. 1.

106.    Upon information and belief, the EvokeDx system has a computer processor which is further programmed, upon stopping a collection of data after receiving said indication that the data collected is reliable, to determine if said data passes a scattering check. *See e.g.*, Exhibit H, Fig. 1.

107.    Konan will continue to infringe the '795 Patent unless enjoined by this court.

108.    Hu has assisted Konan in designing its EvokeDx product which infringes the '795 Patent and was aware of such infringement.

### SIXTH CLAIM FOR RELIEF

### Patent Infringement of the '189 Patent

109.    Plaintiff repeats and re-alleges each and every allegation contained in the preceding paragraphs, as if fully set forth herein.

110.     Plaintiff has the right to sue and recover for infringement of the '189 Patent.

111.     Konan has infringed and continues to infringe the '189 Patent, either literally and/or under the doctrine of equivalents, by making, using, providing, offering, offering for sale, and/or selling in the United States certain electrodes disclosed and claimed in the '189 Patent, including, but not limited to Konan's "Carbon Curvilinear Disposal Medical Electrodes" which it only recently began selling.

112.     Konan has, upon information and belief, apart from Hu, infringed and is still infringing, one or more claims of the '189 Patent, including but not limited to those claims listed below, and such infringement is occurring in this district and elsewhere in the United States, by making, using, selling, and offering for sale products that embody the inventions claimed in the '189 Patent under 35 U.S.C. § 271(a).

113.     Konan directly infringes and continues to infringe at least claim 1 of the '189 Patent, and selling a device that contains each and every element thereof – at least as set forth hereinafter.

114.     Claim 1 of the '189 Patent is recited below:

>    An electrode sensor for detecting signals emanating from a retina of the eye of a patient, said signals being generated upon stimulation of the retina,
>
>    said electrode sensor comprising a multilayer assembly comprising a base layer, an electrode deposited on said base layer and a conductor deposited on said base layer connected to said electrode,
>
>    said electrode sensor comprising a first elongated section, said electrode being located on said first elongated section, said first elongated section being sized and shaped to extend from an inner corner of an eye to an outer corner edge of an eye to be secured to skin below a lower eyelid of a patient,
>
>    said electrode sensor comprising a second section, said second section comprising a connector,
>
>    said conductor being located in an intermediate section of said

sensor between said first and second sections, said conductor integrally formed with said electrode,

said multilayer assembly comprising an adhesive layer to attach said electrode sensor to said skin below said lower eyelid.

115.    A photocopy of Konan's DME Carbon CL electrode (hereinafter "CL Electrode") is shown as Exhibit K and the relevant parts are identified by reference numerals where possible. (The elements of claim 1 are reproduced below and contain direct reference to identified portions of the CL Electrode.)

116.    Konan's CL Electrodes (*see* Exhibit K which shows its top and bottom surfaces (base layer)) detect signals emanating from the retina of the eye of the patient. The signals are generated because of stimulation of the retina.

117.    The accused CL Electrodes shown in Exhibit K have a base layer (b), an electrode (e) deposited on the base layer and a conductor (c) deposited on the base layer which is connected to the electrode.

118.    The CL Electrodes have a first elongated section (fes) (Exhibit K) where the electrode is located.

119.    This elongated section (fes) (Exhibit K) is sized and shaped to extend from an inner corner of an eye to an outer corner edge of an eye so that it is secured to the skin below the lower eyelid of a patient.

120.    The CL Electrodes also have a second section (ss) which contains a connector (con). (See Exhibit K)

121.    The CL Electrodes further have an intermediate section (IS) located between the first and second sections which contains a conductor. This section is integrally formed with the electrode. (See Exhibit K)

122.    The CL Electrodes' multilayer assembly has an adhesive layer to attach the

Electrodes to the skin below the lower eyelid.  (The adhesive layer of the CL Electrode is on the base layer.)

123.    As a direct and proximate result of Konan's conduct, Plaintiff has suffered and will continue to suffer irreparable injury for which it has no adequate remedy at law.  Plaintiff also has been damaged and, until an injunction issues, will continue to be damaged in an amount yet to be determined.

124.    Plaintiff seeks enhanced damages pursuant to 35 U.S.C. § 284 and a finding that because Konan's infringement of the '189 Patent has been and continues to be willful, this is an exceptional case within the meaning of 35 U.S.C. § 285, entitling Plaintiff to its attorneys' fees and expenses.

125.    Konan was aware of the '189 Patent and its acts of infringement were willful and have caused damage to Plaintiff, and Plaintiff is entitled to recover from Konan the damages sustained by Plaintiff as a result of Konan's wrongful acts in an amount subject to proof at trial.

## SEVENTH CLAIM FOR RELIEF

### Unfair Competition, Trademark Infringement, and False Advertising under the Lanham Act -- 15 U.S.C. §1125(a)

126.    Plaintiff repeats and re-alleges each and every allegation contained in preceding paragraphs, as if fully set forth herein.

127.    Plaintiff's trademark rights include Federal Registration No. 3,894,799 ("'799 mark") to the stylized DIOPSYS mark.  The '799 mark was registered on December 21, 2010 (Exhibit L).

128.    Plaintiff owns the '799 mark.

129.    Plaintiff also has common law rights to the DIOPSYS wordmark.  Plaintiff has continuously used these marks in interstate commerce throughout the entire United States

starting on or about 2001.

130.    Plaintiff's trademarks are distinctive for its name and products, which have acquired secondary meaning.

131.    Despite knowing that the DIOPSYS domain name was owned by Diopsys, upon information and belief Konan, in bad faith, purchased the DIOPSIS domain name.

132.    This unlawful purchase of the DIOPSIS domain name caused Diopsys untold damages because internet users were automatically directed to the Konan website when they entered the DIOPSIS name.

133.    Upon realizing that Konan had perpetrated this unlawful act, Diopsys immediately notified Konan and demanded that it stop using the DIOPSIS domain name.

134.    Konan stopped using the DIOPSIS domain name for a few weeks and then began using it again.

135.    Konan continued to unlawfully cybersquat with the repeated use of the DIOPSIS domain name.

136.    Diopsys then demanded that Konan stop cybersquatting and transfer the domain name DIOPSIS to Diopsys.  Konan then made such transfer.

137.    Upon information and belief, Konan has unlawfully purchased "ad words" that redirect those internet users that enter Diopsys to the Konan website.

138.    Upon information and belief, Konan's sales personnel have marketed, offered for sale and/or sold its EvokeDx machine with DME Carbon R Electrodes to customers by stating in words or substance that the EvokeDx machine with its Carbon R Electrodes is of the same or similar quality and produces the same or similar results as to the Diopsys Nova machine with patented underlid electrodes sold by Diopsys, even though the quality of Konan's DME Carbon

21

R Electrodes are inferior to Diopsys' patented technology. These false and/or misleading statements are deceptive in nature and have at least a tendency to deceive a substantial portion of the intended customers. This deception is material in that it has likely and will likely influence purchasing decisions of Konan's EvokeDx systems. Upon information and belief, the Konan electrodes and sensors travel in interstate commerce. These unlawful acts have and will continue to cause damage to Diopsys.

139.    Konan has recently begun to offer its SME Carbon CL eyelid sensor product which is materially different from its Carbon R product and which EvokeDx system with its SME Carbon CL sensor infringes the '189 Electrode Patent, thus contradicting Konan's own prior statements about its Carbon R sensor.

140.    Konan's acts of cybersquatting identified above were willful and deliberate.

141.    Konan has profited from its illegal and bad faith activities.

142.    Plaintiff has suffered, and continues to suffer, substantial damages as a result of Konan's bad faith activities, in an amount to be determined by the jury and this Court.

**EIGHTH CLAIM FOR RELIEF**

**Copyright Infringement Under 17 U.S.C. §106**

143.    Diopsys is the claimant and owner for computer code which operates its Electrophysiography analysis device. Such code has been registered with the Copyright Office as Registration Number TX-8-270-176, issued by the United States Copyright Office on or about November 21, 2016 and Registration Number TXu-988-594 issued by the United States Copyright Office on or about February 13, 2001. (Exhibits M and N)

144.    Defendants Hu and Konan have utilized such Diopsys Source Code which runs its EvokeDx device (the "Accused Source Code"). The EvokeDx device is substantially similar to a Neucodia Eletrophysiology Analysis Device produced by Hu after he left Diopsys in 2002. The

22

operation of such devices involve numerous computer programs which are embodied in computer code, including computer code generating for Fourier Analysis of data produced by said devices.  Upon information and belief, Hu misappropriated at least the Diopsys Source Code in the Neucodia device which has now been marketed by Konan as the accused EvokeDx device.

146.    Konan and Hu have infringed the copyright rights of Diopsys through the sale and/or distribution of EvokeDx devices.

## NINTH CLAIM FOR RELIEF

### New Jersey Product Disparagement

146.    Plaintiff repeats and re-alleges each and every allegation contained in the preceding paragraphs, as if fully set forth herein.

147.    Konan's above referenced acts of disparaging Diopsys' underlid electrodes were published with malice.  Such behavior was performed to the detriment of Diopsys' business in an effort to disadvantageously interfere with customers.

148.    As a result of Konan's acts, Plaintiff has been injured by Konan's illegal actions and is entitled to the remedies provided under New Jersey State law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

(1)    That the '162, '795 and '189 patents in suit, were duly and legally issued by the U.S. Patent Office, and are valid and enforceable; and

(2)    That Konan, its officers, agents, servants, employees, representatives, attorneys and all persons acting in active concert or participation with it as well as Hu, be found to have infringed the patents in suit; and

(3)    Enjoining Konan, its officers, agents, servants, employees, representatives, attorneys and all persons acting in active concert or participation with it, as well as Hu, from

making, using, selling, or offering for sale products, services and/or product packaging which infringe the patents in suit; and

(4)      Enjoining and restraining Konan, its officers, agents, servants, employees, representatives, attorneys and all persons acting in active concert or participation with it, as well as Hu, from inducing infringement of the patents in suit; and

(5)      That Plaintiff be compensated for the damages caused by Defendants' infringement under 35 U.S.C. § 284, in an amount to be precisely determined by an accounting, but not less than a reasonable royalty plus interest and that (a) the award of damages for this exceptional case be trebled as provided by 35 U.S.C. §284 and (b) that Plaintiff be awarded its costs and attorneys' fees incurred in prosecuting this action, including reasonably attorney's fees, as provided for by 35 U.S.C. § 285, (plus interest); and

(6)      That Defendants be ordered to turn over to the Court or to Plaintiff or to destroy within ten (10) days from the entry of any Final Judgment or Preliminary Decree entered in this action, all property owned by Defendants which unlawfully violate any of the patents in suit, any infringing product literature or internet based information owned or distributed by Konan, and all other works owned by Defendants that infringe the patents in suit, including an award of costs incurred by Plaintiff for the destruction of said articles and product packaging; and

(7)(a)   That the Settlement Agreement be corrected as to the typographic error contained in paragraph 6 so that the Settlement Agreement properly lists the number for the '650 Patent next to the subject matter "Method and Apparatus for an Automated Procedure to Detect and Monitor Early-Stage Glaucoma";

OR

(7)(b)   That the Settlement Agreement does not restrict Diopsys' ability to enforce the

'162 Patent;

OR

(7)(c)   That Defendants are required to assign the '650 Patent to Diopsys in the event the Settlement Agreement covers the '162 Patent and not the '650 Patent; and

(8)      That Defendants be adjudged to have engaged in federal unfair competition, trademark infringement and false advertising under Section 43 of the Lanham Act, 15 U.S.C. §1125; and

(9)      That Defendants be adjudged to have engaged in product disparagement under the statutory and common law of the State of New Jersey; and

(10)     That Defendants be adjudged to have infringed Plaintiff's copyrights TX-8-270-176 and TXu-988-594; and

(11)     That Plaintiff be awarded all damages as a result of Defendants' copyright infringement, including any and all enhanced damages allowable; and

(12)     That Plaintiff be awarded punitive or exemplary damages under New Jersey law because of the egregious, malicious, and tortious conduct of Defendants complained of herein; and

(13)     That Plaintiff recovers the costs of this action including their expenses and reasonable attorney's fees pursuant to 35 U.S.C. §285 and 15 U.S.C. §1117 and all further applicable law, because of the deliberate and willful nature of the infringing activities of Defendants sought to be enjoined hereby, which make this an exceptional case warranting such award; and

(14)     That Plaintiff be awarded pre-judgment and post-judgment interest; and

(15)     That Plaintiff obtain all further relief permitted under the laws of the United

States and the State of New Jersey; and

(16)    That Plaintiff obtain all such other and further relief as the Court may deem just

and equitable.

## **JURY DEMAND**

Plaintiff demands a jury trial on all issues so triable.

Dated:  July 13, 2017                    **REITLER KAILAS & ROSENBLATT LLC**

By: *s/ Brett Van Benthysen*
Brett Van Benthysen
885 Third Avenue, 20th Floor
New York, NY 10036
Telephone: (212) 209-3045
Facsimile: (212) 371-5500
Email: bvanbenthysen@reitlerlaw.com

**LEVISOHN BERGER LLP**
Peter L. Berger (*admitted pro hac vice*)
Jonathan Berger (*admitted pro hac vice*)
11 Broadway, Suite 615
New York, New York 10004
Telephone: (212) 486-7272
Facsimile: (212) 486-0323
Email: pberger@llbl.com
        jberger@llbl.com

*Attorneys for Plaintiff Diopsys, Inc.*